IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANIEL DUGAN et al., | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MATTHEW O'HARA et al., | : | No. 14-5252 |
| Defendants. | : | |

PRATTER, J.                                                                                                                              AUGUST 28, 2015

**MEMORANDUM**

Daniel Dugan and his wife, Melissa Dugan, allege that Matthew O'Hara physically assaulted Mr. Dugan in October 2013 during a work outing at a Philadelphia Flyers game. Mr. Dugan further alleges that Healthcare Services Group, Inc. ("HSG"), his former employer, wrongfully terminated his employment in violation of Pennsylvania law and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* In addition, Mrs. O'Hara claims that the Defendants are liable to her for loss of consortium.[1] Now before the Court is Defendants' Renewed Motion to Enforce Settlement (Docket No. 33), in which Defendants ask the Court to dismiss this lawsuit on the grounds that Mr. Dugan already settled his claims against Defendants.[2] For the reasons that follow, the Court grants the motion.

---

[1] Plaintiffs name Mr. Dugan's uncle Raymond Crouse, a co-worker at HSG, as a defendant in this lawsuit, but the Amended Complaint (Docket No. 30) does not purport to state any particular claim against Mr. Crouse.

[2] After HSG and Mr. Crouse filed the Renewed Motion to Enforce Settlement (Docket No. 33), Mr. O'Hara filed a Motion to Join Defendant's Renewed Motion to Enforce Settlement (Docket No. 42). The Court grants Mr. O'Hara's Motion to Join, and therefore treats the Renewed Motion to Enforce Settlement as having been filed on behalf of all Defendants.

# I. FACTS

## A. Allegations in the Amended Complaint

In October 2013, HSG employed Mr. Dugan as a Financial Services Manager. On or about October 17, 2013, Mr. Dugan attended a Philadelphia Flyers game during a "team building" outing with several co-workers, including Mr. O'Hara. According to Mr. Dugan, many work outings coordinated by HSG are "alcohol-fueled affairs in which employees are permitted and, in fact, encouraged to drink to severe intoxication." (Am. Compl. ¶ 10). The group ate dinner and consumed alcoholic beverages at the Victory Beer Hall before the game, and then watched the hockey game from the Cadillac Grill inside the Wells Fargo Center.

Mr. Dugan alleges that while at the Cadillac Grill, without warning or physical provocation, Mr. O'Hara grabbed Mr. Dugan by the throat, picked him up, pinned him against the bar, and then slammed him to the ground. Mr. O'Hara allegedly choked Mr. Dugan until Mr. Dugan lost consciousness. After Mr. Dugan regained consciousness, he left the game and returned home. He awoke the next day feeling dizzy and nauseous. He was treated by his family doctor, diagnosed with a concussion and contusions, and instructed not to return to work until his concussion symptoms subsided.

On October 19, 2013, Mr. Dugan met with his uncle Raymond Crouse, who was a manager at HSG. Mr. Crouse informed Mr. Dugan that HSG planned to "separate itself" from both Mr. Dugan and Mr. O'Hara. (Am. Compl. ¶ 21). Mr. Crouse advised Mr. Dugan that if Mr. Dugan resigned and dropped all criminal and civil charges, he would help Mr. Dugan secure four weeks of severance pay and a new job.

On October 22, 2013, Mr. Dugan met with HSG's upper management and legal counsel. After Mr. Dugan gave them a statement, they encouraged him to "forgive and forget," and to continue working with Mr. O'Hara. (Am. Compl. ¶ 25). They also encouraged Mr. Dugan to

complete the relevant FMLA paperwork for the work he missed after the incident. Mr. Dugan was then suspended from work, and upon his return, was demoted to a training program because he was not willing to "forgive and forget." Mr. Dugan refused the demotion, and HSG terminated his employment.

    B.  Evidence of Settlement[3]

In January 2014, in connection with a workers' compensation claim, Mr. Dugan retained attorney Christopher Fox of Pond Lehocky Stern Giordano to represent him. Mr. Dugan also applied for unemployment compensation benefits in February 2014, and after his application was denied, Mr. Dugan appealed. A hearing before the unemployment compensation referee was scheduled for May 1, 2014. Mr. Fox's office referred Mr. Dugan to the law firm of Weisberg Law and attorney Matthew Weisberg for representation at the unemployment compensation hearing, and in connection with any related civil claims Mr. Dugan might wish to pursue.

On April 30, 2014, Mr. Dugan was deposed in connection with his workers' compensation claim. Immediately after the deposition, Mr. Fox and Shina Jenkins, HSG's Workers' Compensation Claims Manager, began negotiating a settlement. The scope of the settlement negotiations was not limited to the workers' compensation claim, but rather extended to Mr. Dugan's unemployment compensation claim and any other civil claims he might bring against HSG or HSG's employees. Mr. Dugan wanted Mr. Weisberg to approve of any settlement that would resolve the unemployment compensation claim or other civil claims against HSG or HSG's employees. Around 5:00 p.m., Mr. Dugan spoke to Mr. Weisberg and "expressed to [Mr. Weisberg] exactly what had occurred at the deposition, the [settlement] offers." (Dugan Dep.

---

[3] On October 20, 2014, HSG filed a Motion to Enforce Settlement (Docket No. 4). In an order dated December 1, 2014, the Court deemed moot HSG's motion, but permitted limited discovery on the issues raised in it. This section of the opinion summarizes the facts that came to light as a result of that discovery.

150:1-4). Mr. Dugan testified that he asked Mr. Weisberg for his thoughts on the proposed settlement, and Mr. Weisberg responded, "I don't agree, but it's on you, whatever you want to do." (Dugan Dep. 150:4-7). Negotiations continued into the evening by telephone and email, and Mr. Fox and Mr. Dugan spoke by phone multiple times that evening regarding the status of negotiations.

Ultimately, Ms. Jenkins offered a total of $125,000, along with a promise that HSG would neither attend nor contest Mr. Dugan's unemployment compensation hearing. In exchange, HSG sought a release of all claims against HSG and its employees. Mr. Fox testified that after he received the offer, he tried "repeatedly" to contact Mr. Weisberg so they could discuss it, but he was unable to do so. (Fox Dep. 39:19-24). Mr. Fox conveyed the offer to Mr. Dugan. The parties dispute what happened next. According to Mr. Fox, Mr. Dugan also tried to reach Mr. Weisberg that evening, but after he was unable to speak with Mr. Weisberg, he authorized Mr. Fox to accept the offer because he "was frustrated and just wanted to be done with it." (Fox Dep. 59:23-24). According to Mr. Dugan, he did not authorize Mr. Fox to accept the offer without first consulting Mr. Weisberg.[4]

Later that night, Mr. Fox informed Ms. Jenkins that Mr. Dugan had accepted the offer and proposed apportioning the settlement proceeds so that $110,000 would be attributable to the resolution of Mr. Dugan's workers' compensation claim and $15,000 would be attributable to the resolution of Mr. Dugan's other civil claims. (Fox Dep. 45:8-47:7). Ms. Jenkins agreed, and at

---

[4] Mr. Weisberg similarly testified that at the outset of his relationship with Mr. Dugan, he likely told Mr. Dugan, "you can't compromise the case you want me here for unless you don't want me." (Weisberg Dep. 79:14-24). In other words, the "message to both [Mr.] Fox and Mr. Dugan was that they were not to do anything to compromise the third-party cases or the tort case." (Weisberg Dep. 27:14-18; *see also id.* at 30:4-8 ("I remember being unequivocal that there's not to be a compromise of the tort claim by any release or even the appearance of a release.")). Mr. Weisberg testified that he lacks personal knowledge about the April 30 conversations between Mr. Dugan and Mr. Fox.

9:31 p.m., Mr. Fox wrote in an email to Mr. Dugan, "We are good to go. 110 + 15. I will BCC you on a more formal email to the employer later tonight . . . ." (Ex. HSG-3). Then, at 10:07 p.m., Mr. Fox emailed Ms. Jenkins, with a blind carbon copy to Mr. Dugan, memorializing the terms of the settlement as follows:

> Please let this email confirm that we've agreed to settle the case with the following terms:
>
> -Lump sum settlement of $110,000 to resolve the workers compensation case by full C&R
>
> -Outstanding medical bills and litigation costs incurred prior to the date of C&R approval to be paid by employer
>
> -Additional consideration of $15,000 in exchange for a general release, including all employment and civil liability claims
>
> -The exact language contained in the separate general release will be negotiated directly with the claimant's employment attorney, Matthew Weisberg
>
> -The aforementioned $15,000 consideration for the general release will be paid via 1099 with no tax withholdings
>
> -There will be no contest of the pending UC appeal, including an agreement not to appear at tomorrow's hearing

(Jenkins Decl. Ex. A 2). Mr. Fox testified that he discussed each of these bullet points with Mr. Dugan before he sent it to Ms. Jenkins, and that Mr. Dugan instructed him to include the fifth bullet point. Mr. Dugan testified that he received the email on or about April 30. Ms. Jenkins responded to Mr. Fox's email, "Just want to be crystal clear per our discussion last night, all releases of [HSG] shall apply to all of its officers, directors, employees, shareholders, etc." (Ex. HSG-5 at 1). Mr. Fox responded, "Agreed. Thanks." (Ex. HSG-5 at 1).

The next day, based at least in part on HSG's failure to appear at the hearing pursuant to the terms of the settlement agreement, the unemployment compensation referee reversed the previous denial of benefits. On that same day, Mr. Dugan informed Mr. Weisberg about the terms of the settlement. In the month that followed, neither Mr. Dugan nor Mr. Weisberg did anything to

5

repudiate the settlement. On May 8, 2014, Mr. Fox asked Ms. Jenkins to provide draft settlement documents for Mr. Weisberg to review. On May 20, 2014, one of HSG's attorneys called Mr. Weisberg's office to discuss the settlement agreement, and then sent a draft settlement agreement to Mr. Weisberg's colleague. Mr. Weisberg received an email from his colleague that included the draft settlement agreement, but neither Mr. Weisberg nor his colleague immediately responded to HSG's attorney.

Approximately two weeks later, Mr. Weisberg told Mr. Fox that the case could not be resolved because the settlement might preclude Mr. Dugan from filing a lawsuit against Mr. O'Hara. Then, Mr. Fox wrote to Ms. Jenkins, "I finally spoke with the other attorney, [Mr.] Weisberg. He had advised my client not to resolve employment/third party case for 15k. My client is following his advice in that regard. Unfortunately, this is beyond my control . . . ." (Ex. HSG-6 at 1). In response to Mr. Fox's email, Kenneth Kleinman, HSG's employment counsel, wrote, "[I]n reliance upon the understanding that Mr. Dugan had agreed to the terms you had set out in your email of April 30, [HSG] had foregone its right to contest Mr. Dugan's application for unemployment compensation benefits. Mr. Dugan has gotten the benefit of that part of the agreement, while [HSG] will not obtain any consideration for that benefit." (Ex. HSG-7 at 1). On May 28, 2014, in an email to Mr. Dugan and Mr. Weisberg, Mr. Fox wrote that Mr. Dugan "ultimately gave [him] authority to proceed" with sending the email that HSG cites as evidence of a binding agreement. (Ex. HSG-8). Indeed, when Mr. Weisberg later asked Mr. Fox to sign an affidavit averring that Mr. Dugan had *not* given him authority to agree to a global settlement of all of Mr. Dugan's claims against HSG and its employees, Mr. Fox replied, "I can't sign this affidavit as written. I did agree to resolve the case pending review of documents by you. At the time I did this, I was under the impression that I had authority to do so as granted by the client." (Ex. HSG-38 at 42). In August 2014, Mr. Dugan and HSG executed a Workers' Compensation Compromise

and Release, whereby HSG agreed to settle Mr. Dugan's workers' compensation claim for $110,000.

## II. LEGAL STANDARD

"It is well settled that a federal court has the inherent power to enforce and to consider challenges to settlements entered into in cases originally filed therein." *Fox v. Consol. Rail Corp.*, 739 F.2d 929, 932 (3d Cir. 1984); *see, e.g.*, *Millner v. Norfolk & W.R. Co.*, 643 F.2d 1005, 1009 (4th Cir. 1981) ("A number of courts have recognized the authority of a trial court summarily to enforce a settlement agreement and to enter judgment based on that agreement without plenary hearing.").[5] "This authority, however, arises not under Rule 56 of the Federal Rules of Civil Procedure but under the trial court's inherent equitable power summarily to enforce a settlement agreement when the practical effect is merely to enter a judgment by consent." *Millner*, 643 F.2d at 1009; *see Tiernan v. Devoe*, 923 F.2d 1024 (3d Cir. 1991) (recognizing that district courts may grant "summary enforcement of settlements" under appropriate circumstances).

Nevertheless, "[c]ourts treat a motion to enforce settlement under the same standard as a motion for summary judgment because the central issue is whether there is any disputed issue of material fact as to the validity of the settlement agreement." *Martin v. Hoveround Corp.*, No. 10-39790, 2011 WL 742573, at *2 (D.N.J. Feb. 24, 2011) (citing *Washington v. Klem*, 388 F. App'x

---

[5] Plaintiffs argue that the Court lacks jurisdiction to decide Defendants' Motion to Enforce Settlement, but Plaintiffs cite no authority in support of their argument and the clear weight of authority demonstrates that courts have jurisdiction to enforce settlement agreements in cases that are otherwise properly before them. *See, e.g.*, *Capek v. Mendelson*, 821 F. Supp. 351, 356 & n.12 (E.D. Pa. 1993) (finding that district courts have jurisdiction to enforce settlement agreements when "[t]he action is still pending, and the party seeking enforcement of the settlement agreement asserts the agreement—repudiated by his adversary—to terminate the action"). The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331, because Mr. Dugan's claim under the FMLA arises under the laws of the United States, and pursuant to 28 U.S.C. § 1332, because Plaintiffs are citizens of New Jersey, Defendants are citizens of Pennsylvania, and the amount in controversy exceeds $75,000. Therefore, the Court has jurisdiction to enforce a settlement purporting to release all of Plaintiffs' claims against Defendants.

84, 85 (3d Cir. 2010)). "This is not mere coincidence. The stakes in summary enforcement of a settlement agreement and summary judgment on the merits of a claim are roughly the same—both deprive a party of his right to be heard in the litigation." *Tiernan*, 923 F.2d at 1031. Therefore, "[a] motion to enforce settlement should be reviewed under the same standard as a motion for summary judgment: the non-movant's assertions must be treated as true; the non-movant must be given the benefit of the doubt when their assertions conflict with the movant's assertions; and the movant must be entitled to enforcement as a matter of law." *Roberts Enterprises, LP v. Fun Sport, Inc.*, No. 06-490, 2008 WL 10712416 (D. Del. Mar. 7, 2008). As with motions for summary judgment, the non-movant must provide evidentiary support for any assertions on which it wishes to rely in opposing a motion to enforce settlement. *Cf. Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) ("Unsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment.").

### III. DISCUSSION

#### A. Settlement Agreement

"The validity and enforceability of settlement agreements is governed by state contract law." *Shell's Disposal & Recycling, Inc. v. City of Lancaster*, 504 F. App'x 194, 200 (3d Cir. 2012). "It is by now axiomatic under Pennsylvania law that 'the test for enforceability of [a settlement] agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced.'" *Calif. Sun Tanning USA, Inc. v. Elec. Beach, Inc.*, 369 F. App'x 340, 346 (3d Cir. 2010) (quoting *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 298-99 (3d Cir. 1986)). "In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter." *Espenshade v. Espenshade*, 729 A.2d 1239, 1243 (Pa. Super. Ct. 1999). "An agreement to settle a law suit, voluntarily entered into, is binding

8

upon the parties, whether or not made in the presence of the court, and even in the absence of a writing." *Green v. John H. Lewis & Co.*, 436 F.2d 389, 390 (3d Cir. 1970). "Where the parties have agreed on the essential terms of a [settlement agreement], the fact that they intend to formalize their agreement in writing but have not yet done so does not prevent enforcement of such agreement." *Mazzella v. Koken*, 739 A.2d 531, 536 (1999) (internal citations omitted); *see Thomas v. Univ. of Pa.*, No. 06-1916, 2007 WL 2891739, at *2 (E.D. Pa. Oct. 2, 2007) ("A settlement agreement is still binding even if . . . a party had a change of heart between the time he agreed to the terms of the settlement and when those terms were reduced to writing." (internal quotation marks omitted)). "If all of the material terms of a bargain are agreed upon, the settlement agreement will be enforced. If, however, there exist ambiguities and undetermined matters which render a settlement agreement impossible to understand and enforce, such an agreement must be set aside." *Id.* (internal citation omitted).

The undisputed evidence in the record before the Court demonstrates that the parties entered into an enforceable settlement agreement whereby Mr. Dugan waived his claims against Defendants, and HSG agreed to pay a global settlement amount and not to contest the unemployment compensation benefit appeal. In the email from 10:07 p.m. on April 30, 2014, Mr. Fox wrote, "Please let this email confirm that *we've agreed to settle the case* with the following terms." (Ex. HSG-4; Jenkins Decl. Ex. A 2 (emphasis added)). This is a clear representation on Mr. Dugan's behalf that Mr. Dugan intended to be bound by the settlement agreement. *See Channel Home Ctrs.*, 795 F.2d at 298-99; *Am. Eagle Outfitters*, 584 F.3d at 582. The list of terms included "$15,000 consideration" in exchange for a "general release," and Mr. Fox confirmed in an email later that same night that the "general release" applied "to all of [HSG's] officers, directors, employees, shareholders, etc." The terms of the settlement agreement are precise and

9

nothing of significance is missing. It is therefore an enforceable settlement agreement barring the claims raised in this case.[6]

The Court finds unpersuasive Mr. Dugan's arguments that there was no enforceable settlement agreement. First, Mr. Dugan argues that Mr. Fox lacked the authority to agree to any settlement agreement because he was told to check with Mr. Weisberg before settling any claims other than the workers' compensation claim. Under Pennsylvania law,[7] an attorney may enter into a binding settlement agreement with the express authority of his client, *Tiernan*, 923 F.2d at 1033, and there is a rebuttable presumption that "a settlement entered into by an attorney has been authorized by the client." *Rockey v. Big Spring Sch. Dist.*, 699 A.2d 1331, 1334 (Pa. Commw. Ct. 1997) (citing *Garabedian v. Allstates Eng'g Co.*, 811 F.2d 802, 803 (3d Cir. 1987)). Where there is a dispute regarding an attorney's authority to settle a case, a court may find express authority "where the client delayed in asserting the lack of authority, or where it is clear that the real motive for challenging a settlement involved a change of heart." *Transport Int'l Pool, Inc. v. Alternative Transp., Inc.*, No. 07-2895, 2008 WL 2550598, at *5 (E.D. Pa. June 25, 2008) (citing *Farris v. JC Penney Co., Inc.*, 176 F.3d 706, 713 (3d Cir. 1999)). In other words, "a client may ratify counsel's actions when he learned a settlement was reached and took no action to repudiate counsel's authority to settle." *Id.* (citing *Piluso v. Cohen*, 764 A.2d 549, 551 (Pa. Super. Ct. 2000)); *see Yarnall v. Yorkshire Worsted Mills*, 87 A.2d 192, 193 (Pa. 1952) ("A client ratifies his attorney's

---

[6] The settlement agreement also bars Mrs. Dugan's claim for loss of consortium. "Loss of consortium has been recognized in this Commonwealth as a right evolving out of the marriage relationship and is grounded on the loss of a spouse's service after injury." *Sprague v. Kaplan*, 572 A.2d 789, 790 (Pa. Super. Ct. 1990). "It is well-established that, under Pennsylvania law, a spouse's right to recover for loss of consortium derives only from the other spouse's recovery in tort." *Szydlowski v. City of Philadelphia*, 134 F. Supp. 2d 636, 639 (E.D. Pa. 2001). As a result, Mr. Dugan's agreement to settle his claims against Defendants also resolved Mrs. Dugan's claim for loss of consortium.

[7] Federal courts determining the scope of an attorney's authority to make a settlement offer apply state agency law. *See Tiernan* 923 F.2d at 1032-33.

act if he does not repudiate it promptly upon receiving knowledge that the attorney has exceeded his authority").

Assuming for purposes of the motion that there is a genuine dispute as to whether Mr. Dugan instructed Mr. Fox to agree to the proposed settlement agreement, the Court finds that the dispute is immaterial because Mr. Dugan ratified Mr. Fox's acceptance of the settlement agreement by failing to promptly repudiate it after having received clear recitation of its terms. Mr. Dugan, or Mr. Weisberg on Mr. Dugan's behalf, could have repudiated the settlement agreement (1) after receiving Mr. Fox's email at 9:31 p.m. on April 30, 2014, when Mr. Fox appears to indicate that Mr. Dugan was "good to go" on the settlement; (2) after receiving Mr. Fox's email at 10:07 p.m. on April 30, 2014, when Mr. Fox clearly indicated that Mr. Dugan had agreed to settle the case according to the terms summarized in that email; or (3) after Mr. Dugan told Mr. Weisberg about the settlement agreement on May 1, 2013. Neither Mr. Dugan nor Mr. Weisberg repudiated the settlement agreement at any of those times. Rather, the first time Mr. Weisberg expressed any effort to repudiate the settlement on behalf of Mr. Dugan was on May 21 or 22, when he contacted Mr. Fox and said he had a problem with Mr. Dugan releasing his claims against Mr. O'Hara as part of the settlement agreement. Therefore, even assuming that Mr. Fox had exceeded his authority by accepting the settlement offer on Mr. Dugan's behalf, it is nevertheless undisputed that Mr. Dugan failed to repudiate the settlement agreement "the first moment he receive[d] knowledge that his attorney ha[d] transcended his authority." *Yarnall*, 87 A.2d at 196. Consequently, Mr. Dugan ratified Mr. Fox's acceptance of HSG's settlement offer and cannot argue that Mr. Fox lacked authority to bind Mr. Dugan to the terms of the settlement agreement.

Second, Mr. Dugan argues that there was no binding settlement because Mr. Weisberg had yet to "review any paperwork" relating to the settlement. But "[if] the parties have agreed to the

essential terms of a contract, 'the fact that they intend to formalize their agreement in writing but have not yet done so does not prevent enforcement of such agreement.'" *Shell's Disposal*, 504 F. App'x at 201 (quoting *Mazzella*, 739 A.2d at 536); *see also Am. Eagle Outfitters*, 584 F.3d at 582 ("[P]arties may bind themselves contractually although they intend, at some later date, to draft a more formal document."). Mr. Fox wrote that Mr. Dugan had "agreed to settle the case" with the terms contained in his email. This is an unambiguous indication that the parties had reached an agreement, and because "[t]he key inquiry is not the extent to which the parties have put their agreement in writing, but rather whether the parties agreed to the essential terms of a contract," *Shell's Disposal*, 504 F. App'x at 201, the contract is enforceable even though it had not yet been reduced to writing.[8]

Third, Plaintiffs argue that the parol evidence rule prohibits the Court from considering any evidence of a settlement other than the Workers' Compensation Compromise and Release executed between the Mr. Dugan and HSG. But Defendants argue that the Compromise and Release was executed *pursuant to the terms of the alleged settlement agreement*. Defendants do *not* argue that the Compromise and Release constitutes the entirety of the settlement agreement. As a result, the existence of a written agreement executed pursuant to the terms of an oral agreement will not bar consideration of evidence regarding the larger oral agreement. "Succinctly stated, the purpose of the parol evidence rule is ' . . . to preserve the integrity of written

---

[8] To the extent Plaintiffs argue that Mr. Weisberg *had to* sign off on any settlement for one reason or another, the Court notes that the authority to settle ultimately lies with the client. *See Austin J. Richards, Inc. v. McClafferty*, 538 A.2d 11 (Pa. Super. Ct. 1988) ("It is the litigant and not the attorney who is the master of his cause of action."); *Mattioni, Mattioni & Mattioni, Ltd. v. Ecological Shipping Corp.*, 530 F. Supp. 910, 913 (E.D. Pa. 1982) ("Indeed, it is almost universally held that even if a power of attorney provides in express terms that the client is not to have the right himself to compromise or settle his claim, such a provision is void as against public policy." (internal quotation marks omitted)); *see also* Pa. R. Prof. Conduct 1.2 ("A lawyer shall abide by a client's decision whether to settle a matter."). Thus, Mr. Dugan's failure to repudiate the settlement agreement is the functional equivalent of Mr. Dugan agreeing to settle the case notwithstanding the fact that the lawyer, Mr. Weisberg, had yet to weigh in on the issue.

agreements by refusing to permit the contracting parties to attempt to alter the import of their contract through the use of contemporaneous (or prior) oral declarations.'" *LeDonne v. Kessler*, 389 A.2d 1123, 1126 (Pa. Super. Ct. 1978) (quoting *Rose v. Food Fair Stores, Inc.*, 262 A.2d 851, 853 (Pa. 1970)). Where, as here, it is undisputed that the alleged settlement agreement has not been reduced to writing, the parol evidence rule does not apply.

Finally, Plaintiffs argue the settlement agreement does not bar this action because HSG has not yet paid Mr. Dugan the amount agreed upon in the alleged settlement agreement. "Under Pennsylvania law, an unperformed settlement agreement will bar reinstitution of a prior claim only if the mere promise to perform in the settlement agreement supplies the consideration for the release of the prior claim. If the consideration for the release of the prior claim is performance of the settlement agreement, however, only substantial performance of the obligor's duties under the agreement will extinguish the prior claim." *Capek v. Mendelson*, 821 F. Supp. at 359 (quoting *Polish American Machinery Corp. v. R.D. & D. Corp.*, 760 F.2d 507, 511 (3d Cir. 1985)). Here, the consideration for Mr. Dugan's release of claims against HSG and its employees was the promise to make payments according to the terms of the settlement agreement, not the actual receipt of those payments. Therefore, the settlement agreement is binding notwithstanding HSG's alleged failure to perform already, and the proper remedy for Mr. Dugan would be a suit sounding in breach of contract rather than the reinstitution of the released claims.

        B.      Promissory Estoppel

Defendants also argue that the Court may dismiss this case on a theory of promissory estoppel. "Promissory estoppel is an equitable doctrine that may be invoked to enforce a promise made by one party to another when there is no enforceable agreement between those parties." *I.K. ex rel. B.K. v. Haverford Sch. Dist.*, 567 F. App'x 135, 137 (3d Cir. 2014) (citing *Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000)). "Under Pennsylvania law, a party invoking

promissory estoppel must show that 1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise." *Id.* (internal quotation marks omitted).

Assuming *arguendo* that the settlement agreement is not enforceable, the Court finds that it is appropriate to enforce the settlement agreement and dismiss this case on a theory of promissory estoppel. Mr. Dugan (through his attorney Mr. Fox) promised to release his claims against HSG and its representatives in exchange for, among other things, HSG's promise not to contest Mr. Dugan's claim for unemployment compensation benefits. In light of the fact that (1) the settlement negotiations took place on the eve of Mr. Dugan's unemployment compensation hearing, (2) the email from Mr. Fox to Ms. Jenkins clearly listed HSG's decision not to contest Mr. Dugan's claim as part of the consideration provided in the settlement, and (3) the undisputed evidence in the record demonstrates that HSG had every intention of appearing at Mr. Dugan's hearing until Mr. Fox represented that Mr. Dugan agreed to the settlement, Mr. Dugan should have reasonably expected that his promise (in the form of Mr. Fox's email on his behalf) would induce HSG not to contest Mr. Dugan's unemployment compensation claim. Furthermore, it is undisputed that HSG did not contest Mr. Dugan's appeal in reliance on Mr. Dugan's promise,[9] and the Court finds that injustice can only be avoided by enforcing Mr. Dugan's promise to release all claims against HSG

---

[9] Plaintiffs argue that HSG's failure to contest Mr. Dugan's unemployment compensation appeal is irrelevant because it did not guarantee that Mr. Dugan would receive unemployment compensation benefits. But this argument misconstrues Defendants' position. Defendants argue that HSG's failure to contest Mr. Dugan's unemployment compensation appeal is (1) evidence that the parties reached a settlement agreement that included the non-contest as a material term, (2) consideration supporting the settlement agreement, and (3) the basis for HSG's promissory estoppel argument. The fact that HSG could not guarantee that Mr. Dugan would ultimately receive unemployment compensation benefits does not mean that HSG's agreement to forego the opportunity to contest his appeal was not something of value that was capable of making Mr. Dugan's promise enforceable under appropriate circumstances.

and its employees. It would be manifestly unjust for Mr. Dugan to benefit from his representations to HSG that he had agreed to release his claims against HSG and its employees, but then to bring suit against HSG and its employees. It is only by enforcing Mr. Dugan's promise that HSG can avoid the substantial injustice that would otherwise befall it as a result of its reasonable reliance on Mr. Dugan's promise.

### IV. CONCLUSION

For the foregoing reasons, the Court finds that Mr. Dugan released the claims in this action as part of a binding settlement agreement entered into on April 30, 2013, and that even if the settlement agreement were not binding, Mr. Dugan would be barred from filing suit on a theory of promissory estoppel. The Court therefore grants Defendants' Renewed Motion to Enforce Settlement and dismisses this case with prejudice.[10]

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[10] Plaintiffs request leave to file a second amended complaint, but any amendment would be futile because the undisputed evidence in the record demonstrates that Mr. Dugan settled his claims against Defendants and, alternatively, Mr. Dugan's claims against Defendants are barred on a theory of promissory estoppel. Therefore, Plaintiffs will not be granted permission to file a second amended complaint.